1

**Law Office of Patrick Mause, PLLC**

2

Patrick W. Mause
290 North Meyer
Tucson, Arizona 85701

3

State Bar No. 24269
520.342.0000

4

520.342.0001 (Fax)
EMail:  Patrick@PMauseLaw.com

5

Attorney for Plaintiff Tricia Sanchez

6

7               UNITED STATES DISTRICT COURT

8                     DISTRICT OF ARIZONA

9    Tricia Sanchez,                          Case No.

10                           Plaintiff,       **COMPLAINT**

11        vs.

12   Life Insurance Company of North America,
     a foreign corporation

13                           Defendant.

14

15        For her Complaint, Tricia Sanchez ("Plaintiff"), alleges as follows:

16                   **Parties, Venue, and Jurisdiction:**

17        1.      Plaintiff Tricia Sanchez is a resident and citizen of Pima County, Arizona,

18   and was a resident and citizen of Pima County, Arizona at all times material to the

19   Complaint.

20        2.      Plaintiff's claim is for long-term disability (LTD) benefits, the waiver of

21   her life insurance premiums under the life insurance plan's Life Waiver Of Premium

22   (LWOP) provision, and for other benefits to which she may be entitled and which were

23   provided to her under her employer's ERISA-governed benefits plan (the "Plan").

24        3.      Defendant Life Insurance Company of North America, d/b/a Cigna

25   ("LINA" or "Cigna") is a foreign corporation that is authorized to do business in Arizona

26   and is doing business in Arizona.

27

28

4.     The Court has jurisdiction under the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1001 *et seq*.

5.     Venue is proper in this district pursuant to 29 U.S.C. § 1132(e)(2) and 28 U.S.C. § 1391 because the "breach" of the LTD plan occurred in Pima County, Arizona, and because defendant LINA a.k.a. Cigna may be found in Pima County, Arizona.

**Background:  Ms. Sanchez Became Disabled After Suffering**

**A Burst Cerebral Aneurysm In 2009**

6.     In February 2009, while having her son's birthday party in her home, Ms. Sanchez collapsed on the table.  She was non-responsive.  She had just asked her husband to bring the children inside to sing Happy Birthday.

7.     Neighbors who were at the party called 911, the ambulance came, and Ms. Sanchez was rushed to St. Joseph's hospital.

8.     The physicians diagnosed Ms. Sanchez with a subarachnoid hemorrhage. She had suffered a burst cerebral aneurysm.  They told Ms. Sanchez's husband she likely would not live.

9.     St. Joseph's quickly transferred Ms. Sanchez to Tucson Medical Center's specialized neurological unit where she underwent multiple medical procedures that saved her life.  TMC's neurosurgeon documented that Ms. Sanchez "was found slumped down on the chair at a birthday party of one of her children, yesterday afternoon."  He also documented that she "has had repeated nausea and vomiting" since her aneurysm.

10.     Ms. Sanchez's post-aneurysm treatment included implanting a drainage shunt in her brain and multiple aneurysm "coil embolizations."

11.     In a "coil embolization," a catheter is threaded through the patient's blood vessels into her brain, and a thin "coil" is packed into a bulging blood vessel; i.e. a bulging weak spot in a cerebral blood vessel, or aneurysm, but which has not yet burst. The "coil" fills the aneurysm and prevents blood from flowing into the bulge.  The "coil"

1   thus should prevent the aneurysm from bursting and flooding the brain with pressurized

2   blood, as had happened to Ms. Sanchez at her son's birthday party.

3        12.     As of June 10, 2010, Ms. Sanchez had undergone "a total of eight

4   procedures related to the aneurysm."

5   **After Attempting To Work, Ms. Sanchez Applied For Disability Benefits In 2012,**

6   **Cigna Denied Her Claim, But Then Approved Her Claim On Appeal**

7        13.     After undergoing extensive rehabilitation and multiple medical procedures,

8   Ms. Sanchez attempted to return to work.

9        14.     However, following her burst cerebral aneurysm, Ms. Sanchez suffered

10  multiple problems that affected her ability to work, including but not limited to:  frequent,

11  debilitating headaches with nausea, vomiting, photophobia, and phonophobia; cognitive

12  problems; dizziness; weakness; balance changes; and speech problems; among other

13  things.

14       15.     Ms. Sanchez also suffered side effects from the high-doses of pain

15  medications she was required to take in an effort to reduce the severity of her pain.

16       16.     In August of 2012, Ms. Sanchez stopped work and applied for short-term

17  disability (STD) benefits with Cigna.  Cigna denied Ms. Sanchez's STD claim on

18  September 19, 2012.

19       17.     On March 28, 2013, Ms. Sanchez timely appealed Cigna's denial and

20  included multiple records confirming her ongoing disability, including but not limited to:

21           A. Multiple MRIs (magnetic resonance imaging) and MRAs (magnetic

22               resonance angiogram) objectively documenting Ms. Sanchez's

23               aneurysms and multiple surgeries and procedures to treat her aneurysm.

24           B. Records documenting that Ms. Sanchez continued to suffer vasospasm

25               (spasming of the blood vessels), and residual right-sided weakness of the

26               arm and leg.

27

28

C.  Records documenting that Ms. Sanchez suffered severe headaches and that it is not uncommon for patients with subarachnoid hemorrhage to suffer from chronic headaches.

D.  Neuropsychological evaluation by Dr. Shannah Biggan documenting multiple cognitive deficits from which Ms. Sanchez suffered.

E.  A letter from Ms. Sanchez's primary care physician documenting that Ms. Sanchez continued to suffer severe, debilitating headaches, suffered multiple impairments due to the medications she took, and was unable to work in any occupation due to her conditions.

F.  Headache journal and video declaration of Ms. Sanchez in which she testified about, among other things, the frequency and horrific severity of her headaches.

G.  Home videos taken by Ms. Sanchez's husband showing the effects of headaches Ms. Sanchez rated as a "7" or "8" on a scale of 1-10.

18.    On April 8, 2013, Cigna reversed its decision denying Ms. Sanchez's STD claim, reinstated her benefits, and "transitioned" her claim for evaluation of her LTD claim.

19.    By letter dated April 18, 2013, Cigna forwarded Ms. Sanchez several forms.  In that letter, Cigna also told Ms. Sanchez that she should apply for Social Security Disability Insurance (SSDI) benefits and that if she failed to do so, Cigna would "estimate the amount of Social Security benefits you and your dependents would be entitled to receive and to reduce your Long Term Disability benefits accordingly."

20.    To receive SSDI benefits, a claimant must prove their "inability to engage in any substantial gainful activity" in the national economy.  *See* 42 U.S.C. § 423(d)(1)(A).  The standard to receive SSDI is stricter than Cigna's definitions of disability under the LTD and LWOP plans.

4

21.     Under the LTD Plan, if Ms. Sanchez's claim for SSDI benefits were approved, Cigna would apply a dollar-for-dollar offset to her LTD monthly LTD benefit, substantially reducing Cigna's liability under the Plan.

22.     On April 30, 2013, Ms. Sanchez forwarded her completed forms to Cigna and also forwarded confirmation that she had applied for SSDI benefits.

23.     On May 22, 2013, Cigna approved Ms. Sanchez's LTD claim effective January 24, 2013.

24.     Under the LTD Plan, Ms. Sanchez was entitled to a maximum of two years' of LTD benefits as long as she was unable to perform the material duties of her "own occupation."  Under the LTD plan, the "own occupation" benefit period would end January 22, 2015.

25.     After two years of benefits, i.e. beginning January 23, 2015, Ms. Sanchez was entitled to benefits as long as she was "unable to perform the material duties of any occupation for which he or she is, or may reasonably become, qualified based on education, training or experience."

26.     Also on May 22, 2013, Cigna sent Ms. Sanchez a letter stating that it had started reviewing her Life Waiver Of Premium (LWOP) claim.  Under the life insurance plan, Cigna would keep Ms. Sanchez's life insurance in effect and waive the premiums for that insurance as long as Ms. Sanchez was "unable to perform all the material duties of any occupation for which he or she may reasonably become qualified based on education, training or experience."  Essentially, the LWOP claim applied the same "any occupation" standard that the LTD Plan applied after two years' of LTD benefits had been paid.

27.     On July 2, 2013, Cigna approved Ms. Sanchez's LWOP claim; thus agreeing that due to her conditions, Ms. Sanchez was "unable to perform all the material duties of any occupation" for which she was reasonably qualified.  This is effectively the same standard to receive "any occupation" benefits under the LTD plan.

5

28.     Under the plan's LWOP provision, Ms. Sanchez is entitled to $145,000 in continued life insurance coverage and her premiums on that coverage are waived.

29.     On January 14, 2014, the Social Security Administration approved Ms. Sanchez's SSDI claim after finding she was unable to perform "any work for gain" in the national economy.  The standard to receive SSDI benefits is stricter than the LTD Plan's "own occupation" standard.  The standard to receive SSDI benefits is also stricter than the LTD Plan's "any occupation" standard.  The standard to receive SSDI benefits is stricter than the life insurance plan's "any occupation" standard to receive LWOP benefits.

30.     After multiple delays, Ms. Sanchez received her payment for retroactive SSDI benefits in the fall of 2014 (this was after the government shutdown and sequester, which caused significant delays in the Social Security Administration's processing of Ms. Sanchez's SSDI claim).  After receiving that retroactive SSDI payment, Ms. Sanchez reimbursed Cigna for the overpayment that resulted from her receipt of past-due SSDI payments.

**Cigna Terminated Ms. Sanchez's Benefits Based On The Review Of Its Employee-Physician And Undisclosed "Reed Group Guidelines"**

31.     In the fall of 2014, Cigna began requesting updated records and forms regarding Ms. Sanchez's claim.  After receiving that information, Cigna requested that an in-house nurse and in-house physician review Ms. Sanchez's file to opine regarding her restrictions and limitations.  The purpose of Cigna's request was to evaluate whether Ms. Sanchez — who had been approved for and was receiving SSDI benefits, and whose life insurance waiver of premium claim had been approved — was entitled to benefits under the LTD Plan's "any occupation" standard, which would begin to apply on January 23, 2015.

32.     Cigna's employee-nurse who reviewed Ms. Sanchez's claim was Shelley Hill, RN.  After reviewing limited information, but without reviewing Ms. Sanchez's

complete file, Ms. Hill opined that Ms. Sanchez's claim was unsupported.  Among other things, Ms. Hill noted that the CT scan taken at Ms. Sanchez's August 12, 2014 emergency room visit "showed no acute intracranial hemorrhage and no significant change from 6/5/13… 12/10/14 head MRA showing previously embolized left internal carotid artery aneurysm and right posterior communicating artery aneurysm.  No recurrences and no new aneurysm."

33.    Cigna then referred Ms. Sanchez's claim to its employee-physician, Dr. Steven St. Clair.  Like Nurse Hill, Dr. St. Clair reviewed only limited information, and not Ms. Sanchez's complete file.  After rejecting the opinions of Ms. Sanchez's treating physician as reflected in a form he submitted, and noting that Ms. Sanchez's December 2014 brain MRA "describes stable prior findings without recurrence or new aneurysm," Dr. St. Clair opined:  "Duration of disability has exceeded maximal guidelines provided by the widely accepted external resource from the Reed Group for described conditions without evidence of complication, co-morbidity, or ongoing impairment — headache 3 days."

34.    Dr. St. Clair also rejected Ms. Sanchez's claim of cognitive problems, stating:  "No informal clinical mini-mental status examination or formal neuropsychiatric cognitive assessment is documented.  There is no formal cognitive testing on file."  To the contrary, Dr. Biggan's 2013 formal neuropsychological examination documenting Ms. Sanchez's multiple cognitive problems was in Ms. Sanchez's claim file and therefore available to Dr. St. Clair.  He simply did not review it.

35.    Addressing Ms. Sanchez's SSDI award, Dr. St. Clair said:  "The Social Security Disability system uses different standards of review than those used for this assessment."  While that is actually correct — the SSDI standard to receive disability is stricter than Cigna's — Dr. St. Clair failed to appreciate or consider the differences.

36.    Finally, Dr. St. Clair stated:  "On review and separate analysis of the claim, focusing particularly on the area or areas of disagreement between [treating physician]

Dr. Sanjeev and [Cigna employee] Nurse Case Manager NCM Shelley Hill, in my opinion with a reasonable degree of medical certainty the position of NCM Hill is correct.  Dr. Sanjeevs [sic] opinion is not well supported by medically acceptable clinical, laboratory, and/or imaging findings and is inconsistent with other substantial evidence in the claim file."

37.     Dr. St. Clair therefore opined that Ms. Sanchez should be able to "sit occasionally stand and walk frequently reach at desk level and perform fine manipulation and simple and firm grasping occasionally lift, carry, push and pull up to 10 pounds [sic]. There are no documented impairments of speech, hearing, sight, or cognition."  Of course, Dr. St. Clair provided this theory without reviewing Ms. Sanchez's complete file.

38.     Nobody from Cigna ever identified any ways in which Ms. Sanchez's condition had changed or improved from when it approved her LTD and LWOP claims. Recall, to obtain LWOP benefits, the claimant must be unable to perform the material duties of "any occupation" they are reasonably qualified to perform; essentially the same standard as the "any occupation" standard under the LTD plan.

39.     By letters dated January 22, 2015, Cigna terminated Ms. Sanchez's LTD and LWOP claims.

**After Cigna Refused To Provide All Relevant Information,**

**Ms. Sanchez Timely Appealed Cigna's Decisions On June 24, 2015**

40.     On January 28, 2015, Ms. Sanchez requested "a complete copy of [her] disability claim file, including but not limited to any and all medical records, medical reviews and notes, correspondence, and any other documents Cigna relied upon in terminating Ms. Sanchez's LTD claim."  She also requested a copy of the LTD plan document.

41.     Under ERISA, Cigna has 30 days to provide requested information.  29 U.S.C. § 1132(c)(1)(B).  As the claim administrator, as the Plan's agent and/or joint venture and/or as the *de facto* plan administrator, if Cigna fails to provide the requested

information within 30 days of the request, it may be liable for statutory penalties of up to $110 per day for each day it fails to provide the information. *Id*.; 29 C.F.R. § 2575.502c-1.

42.    On March 9, 2015, more than 30 days after her request, Cigna mailed Ms. Sanchez what it claimed was a complete copy of her claim file.

43.    On April 28, 2015, Ms. Sanchez wrote to Cigna noting that the claim file it had mailed did not include the medical review of Dr. St. Clair, on which Cigna had based its adverse claim decisions.  Ms. Sanchez asked Cigna to "please immediately send me Dr. St. Clair's medical review, and any other information that was not included in the claim file Cigna previously provided."

44.    On May 1, 2015, Cigna sent Dr. St. Clair's medical review to Ms. Sanchez. Cigna did not forward any additional information.

45.    Additional information that appears to be missing from the claim file that Cigna provided includes previous medical reviews.

46.    On May 27, 2015, Ms. Sanchez wrote to Cigna stating:  "Cigna based its decision terminating Ms. Sanchez's LTD claim on an Internal Resource Response medical review by its in-house physician, Dr. St. Clair.  As part of his opinion, Dr. St. Clair says that Ms. Sanchez 'had exceeded maximal guidelines provided by the widely accepted external resource from the Reed Group for described conditions without evidence of complication, co-morbidity, or ongoing impairment-headache 3 days'… Please immediately provide me a copy of the alleged 'widely accepted external resource from the Reed Group' which Dr. St. Clair cited in his review and upon which he relied in evaluating Ms. Sanchez's claim."

47.    Cigna, however, refused to provide the "Reed Group" guidelines on which its employee-physician had relied in opining that Ms. Sanchez was capable of full-time work.

9

48.     The "Reed Group" is a for-profit company owned by another disability insurer.  Like Cigna, the Reed Group has a financial interest in minimizing claim duration and financial exposure.

49.     On June 24, 2015, Ms. Sanchez timely appealed Cigna's decision terminating her LTD and LWOP claims by faxing her appeal letter, and mailing her appeal letter with a DVD containing her appeal documentation.  Because Cigna had refused to provide all pertinent information, including the Reed Group guidelines Cigna relied upon but refused to provide, Ms. Sanchez noted that she filed her appeal "under protest."

50.     In her appeal letter, Ms. Sanchez noted that Cigna had violated ERISA and continued to violate ERISA by withholding material information.

51.     Under ERISA, Cigna has 45 days following its receipt of Ms. Sanchez's appeal to make a decision on her claim.  29 C.F.R. §§ 2560.503-1(i)(1)(i) and (i)(3)(i) (administrator shall notify claimant of decision no later than 45 days "after receipt of the claimant's request for review by the plan").  If "special circumstances" exist, Cigna may extend its deadline by an additional 45 days.  *Id.*  The 45-plus-45 day deadlines begin to run on the date the appeal is filed "without regard to whether all the information necessary to make a benefit determination on review accompanies the filing."  29 C.F.R. § 2560.503-1(i)(4).

52.     Thus, under ERISA, Cigna's maximum, 90-day deadline (i.e. two 45-day periods) to make a decision on Ms. Sanchez's appeal was September 23, 2015; 90 days from when Ms. Sanchez faxed her appeal request to Cigna, not including the date she faxed her request.

53.     With her appeal, Ms. Sanchez sent Cigna medical records, a headache journal, and a video declaration in which Ms. Sanchez testified about her debilitating conditions.

54.     On June 29, 2015, Cigna sent Ms. Sanchez a letter stating:  "We are in receipt of a request for appeal of Ms. Tricia Sanchez's Long Term Disability Claim." Cigna further stated that "as part of the appeals process, Ms. Sanchez may have access to information relevant to her claim, which will be provided upon request free of charge."

55.     On July 8, 2015, Cigna sent Ms. Sanchez a letter stating that it was reviewing her appeal and that "[a]s this constitutes special circumstance [sic] we are requesting the permissible extension of 45 days that is allowed under the ERISA Regulations."

56.     On July 9, 2015, in response to her repeated requests for the "Reed Group" guidelines, Cigna sent Ms. Sanchez a letter directing her to the Reed Group's website.

57.     On July 16, 2015, Ms. Sanchez faxed Cigna additional information confirming her ongoing disability, including a letter from her primary care physician, Dr. Bijay Sanjeev, explaining among other things that:  "Her migraines are debilitating and last as long as four days, they are accompanied by the following symptoms: nausea, vomiting, visual changes, insomnia, depression and difficulty with her short term memory… I feel very strongly that Tricia will never be able to maintain employment due to her medical condition."

58.     Ms. Sanchez's forwarding additional information to Cigna did not restart Cigna's 45-day deadline to make a decision on her appeal, nor its maximum 90-day deadline.  29 C.F.R. §§ 2560.503-1(i)(1)(i) and (i)(3)(i); 29 C.F.R. § 2560.503-1(i)(4); *accord Lewis-Burroughs v. Prudential Ins. Co. of Am.*, 2015 WL 1969299 (D.N.J. Apr. 30, 2015).  Nor does Ms. Sanchez's forwarding information operate to "toll" Cigna's deadline for making a decision on her appeal.  29 C.F.R. § 2560.503-1(i)(3) (administrator may only "toll" deadline for making decision "due to a claimant's failure to submit information necessary to decide a claim"); 29 C.F.R. § 2560.503-1(i)(4); *Lewis-Burroughs*, 2015 WL 1969299 at * 6 (tolling does not apply if claimant submits additional information); *Lavino v. Metro. Life Ins. Co.*, 779 F. Supp. 2d 1095, 1101 (C.D.

Cal. 2011) ("MetLife contends that March 23 should be the relevant start date for calculating the decision because 'Each time plaintiff submitted additional information in support of her claim, the deadline for MetLife to make its claim determination was extended.' (Def. Trial Brief at 21). This contention is meritless."); *Tomassi v. Prudential Ins. Co. of Am.*, 2007 WL 1772117, at *4 (N.D. Ill. June 19, 2007) ("Restarting Prudential's clock every time a claimant submits up records would in many situations give Prudential an endless amount of time to consider appeals and might discourage claimants from submitting relevant new medical information. That cannot be correct.").

59.     On July 20, 2015, Ms. Sanchez wrote to Cigna stating that she was entitled to the Reed Group guidelines under ERISA; that the Reed Group website charged for access to the guidelines; that under ERISA "a provision or practice that requires payment of a fee or costs as a condition to making a claim or appealing an adverse benefit determination would be considered to unduly inhibit the initiation and processing of claims for benefits," 29 C.F.R. § 2560.503-1(b)(3); that Cigna's referring Ms. Sanchez to a pay-for-use website violates ERISA; that Cigna's January 22, 2015 termination letter stated she was entitled to information relevant to her claim "free of charge"; and requesting the immediate production of the complete set of Reed Group guidelines that Cigna relies upon in administering LTD claims to enable her to determine whether the guidelines were misapplied or whether other, relevant guidelines were ignored.

60.     On August 3, 2015, Cigna sent Ms. Sanchez a letter saying it had received her July 20, 2015 letter and would respond soon.

61.     On August 18, 2015, Cigna sent Ms. Sanchez a letter saying that it had requested a "peer review" of her claim, that this constituted a "special circumstance" entitling it to extend its deadline to make a decision on her appeal by *another* 45 days, and that it would make a decision soon.

62.     On September 1, 2015, 43 days after Ms. Sanchez's last request for the Reed Group guidelines, Cigna responded to her request.  In its letter, Cigna stated:  "Ms.

Sanchez is entitled to reasonable access to relevant documents that were relied on in reaching the benefit determination on her claim.  We are providing information below consistent with that entitlement… Guidelines are not used to deny LTD claims, but are utilized as a tool to support ongoing benefits."  Cigna's letter further explained that: "The Reed Group MD Guidelines indicate that the length of disability for headaches, medical or supported treatment, is a minimum of 0 days, optimum of 1 day, and maximum of 3 days, for any class [of work].  ***Guidelines indicate that the length of disability for a ruptured cerebral aneurysm, medical or supported treatment, is a minimum of 91 days, optimum of 182 day [sic], and maximum of indefinite days, for any class [of work]***" (emphasis added).

63.    Recall, Dr. St. Clair, upon whose medical review Cigna terminated Ms. Sanchez's LTD and LWOP claims, wrote "Duration of disability has exceeded maximal guidelines provided by the widely accepted external resource from the Reed Group for described conditions without evidence of complication, co-morbidity, or ongoing impairment — headache 3 days."

64.    In reaching that decision, Dr. St. Clair failed to apply other, relevant guidelines, specifically the guideline for "ruptured cerebral aneurysm," which Cigna acknowledged that it had in its possession, which Dr. St. Clair did not reference, and which provides a guideline maximum disability period of "indefinite days."

65.    In its September 1, 2015 letter, Cigna again refused to provide the actual guidelines.  Instead, Cigna purportedly summarized the guidelines that it had determined were relevant to Ms. Sanchez's claim, while potentially ignoring or refusing to disclose the existence of other relevant guidelines.

66.    On September 10, 2015, Ms. Sanchez again wrote to Cigna noting that Cigna's letter only purported to contain a summary of two guidelines, noting that Cigna "sill has not provided the actual guidelines," noting that Cigna "is clearly failing to apply all relevant guidelines," noting that Cigna's response was therefore deficient, and

1    renewing her request for a copy of the complete Reed Group guidelines Cigna has in its

2    possession or relies upon in administering disability claims.

3        67.    Cigna's deadline for making a decision on Ms. Sanchez's appeal was

4    September 23, 2015.

5        68.    Cigna did not make a final decision on Ms. Sanchez's claim within its

6    ERISA deadlines.  Therefore Ms. Sanchez is deemed to have exhausted her

7    administrative remedies.  29 C.F.R. § 2560.503-1(l) ("In the case of the failure of a plan

8    to establish or follow claims procedures consistent with the requirements of this section, a

9    claimant shall be deemed to have exhausted the administrative remedies available under

10   the plan and shall be entitled to pursue any available remedies under section 502(a) of the

11   Act on the basis that the plan has failed to provide a reasonable claims procedure that

12   would yield a decision on the merits of the claim.").

13       69.    Ms. Sanchez's claims are therefore ripe.

14                    **Count One:  Claim for Benefits Under ERISA**

15       70.    Cigna has failed to make a decision on Ms. Sanchez's appeal within the

16   deadlines imposed by ERISA.  Accordingly, Ms. Sanchez is deemed to have exhausted

17   her administrative remedies and her claim is ripe for judicial review.  29 C.F.R. §

18   2560.503-1(l).

19       71.    Under the Plan, Ms. Sanchez was, and remains entitled to ongoing LTD

20   benefits since the date her benefits were terminated.

21       72.    Ms. Sanchez's disability is permanent.

22       73.    Ms. Sanchez has been damaged by Cigna's improper decision terminating

23   her LTD benefits.

24       74.    Ms. Sanchez has been damaged by Cigna's failure to make a timely

25   decision on her LTD appeal.

26

27

28

75.    The Plan does not grant Cigna discretion to determine entitlement to benefits.  Therefore the Court must review Cigna's decisions under the *de novo* standard of review.

76.    Furthermore, because Cigna failed to make a final decision on Ms. Sanchez's claim within the deadlines prescribed by ERISA, she is entitled to *de novo* review of her claims.

77.    Under the *de novo* standard or review, Cigna's decision was erroneous, contrary to the plan terms, and contrary to the medical evidence.  Ms. Sanchez is entitled to continuing LTD and LWOP benefits under the Plan.

78.    Even under the abuse of discretion standard of review, Cigna abused its discretion because its decisions terminating Ms. Sanchez's benefits were arbitrary and capricious and because they were caused or influenced by Cigna's, its reviewing physicians', and the Plan's financial conflicts of interest or improper behaviors or motivations.  These conflicts of interest precluded the full and fair review required by ERISA, 29 U.S.C. 1133(2) and 29 C.F.R. § 2560.503-1(g)(1) and (h)(2).  Ms. Sanchez is entitled to continuing LTD and LWOP benefits.

79.    Upon information and belief, Cigna and its employees and consultants who evaluated Ms. Sanchez's claim suffer from financial conflicts of interest which infected the claim process and which precluded a full and fair review of Ms. Sanchez's claim.

80.    Cigna and the Plan have a parsimonious claims handling history.  *See e.g. Salomaa v. Honda Long Term Disability Plan*, 642 F.3d 666, 678 (9th Cir. 2011); *see also* Cigna March, 2013 Regulatory Settlement Agreement.[1]

81.    Cigna has a history of improper claim administration.  *Id*.

82.    Cigna violated the terms of the Regulatory Settlement Agreement in administering Ms. Sanchez's claim.

---

[1] Available at:
https://www1.maine.gov/pfr/insurance/Admin_Enforcement_Actions/RSA_2013/CIGNA_RSA.pdf

15

83.     Ms. Sanchez is entitled to discovery regarding the effects of the procedural irregularities that occurred during the claims handling process and regarding the effects of Cigna's, its reviewing physicians', its employees', and the Plan's financial conflicts of interest, biases, and motivations on the decision terminating Ms. Sanchez's LTD claim.

84.     Ms. Sanchez has been injured and suffered damages in the form of lost LTD and LWOP benefits as a result of Cigna's and/or the Plan's wrongful decision to terminate her disability benefits and their failure to timely reinstate her benefits.

85.     Ms. Sanchez has been further injured and suffered damages by losing other benefits to which she may have been entitled under her employer's ERISA-governed benefits plan.

86.     Pursuant to ERISA, 29 U.S.C. § 1132, Ms. Sanchez is entitled to recover unpaid disability benefits, reinstatement of her LTD and LWOP benefits, prejudgment interest, reasonable attorney's fees, and costs from the Plan, and/or Cigna; and/or is entitled to an order enforcing her right to disability benefits under the LTD plan and under the LWOP provision of the life insurance plan.

**Count Two:  Claim For Statutory Penalties Under ERISA**

87.     The written plan document provided by LINA/Cigna during the claim process does not identify University Physicians Healthcare as the Plan Administrator.

88.     The written plan document disclosed by LINA/Cigna during the claim process does not provide an address for University Physicians Healthcare.

89.     The written plan document disclosed by LINA/Cigna during the claim process does not provide any contact information for University Physicians Healthcare.

90.     Upon information and belief, University Physicians Healthcare is no longer in business or operation and/or is inactive or has been administratively dissolved.

91.     Upon information and belief, the plan administrator is no longer in business or operation and/or is inactive or has been administratively dissolved.

92.     Defendant LINA/Cigna insures and administers LTD benefits under the Plan.

93.     Defendant LINA/Cigna is the named fiduciary for deciding claims for benefits under the Plan.

94.     Defendant LINA/Cigna is the named fiduciary for administering claims under the Plan.

95.     Defendant LINA/Cigna is responsible for all claim-handling activities under the Plan.

96.     Defendant LINA/Cigna is responsible for determining what information to consider and/or rely upon in making claim decisions.

97.     Defendant LINA/Cigna is responsible for maintaining records of what information it considered and/or relied upon in making claim decisions.

98.     Defendant LINA/Cigna is responsible for providing claimants with the information it considered and/or relied upon in making claim decisions to claimants upon their written request.

99.     Defendant LINA/Cigna has actual and/or apparent authority to provide claimants with information it considered and/or relied upon in making claim decisions to claimants upon their written request.

100.    In providing claim information to Ms. Sanchez upon her written request, Defendant LINA/Cigna was acting within the scope of its actual and/or apparent authority.

101.    Defendant LINA/Cigna is the Plan's agent for administering claims under the Plan.

102.    Defendant LINA/Cigna is the Plan's agent for providing information relating to claim decisions made by LINA/Cigna to claimants upon the claimant's written request.

17

103.    For purposes of providing information relating to claim decisions made by LINA/Cigna to claimants upon their written request, LINA/Cigna and the plan administrator have a contractual agreement whereby LINA/Cigna is responsible for providing claim-related information to claimants.

104.    For purposes of providing information relating to claim decisions made by LINA/Cigna to claimants upon their written request, LINA/Cigna and the plan administrator have a joint interest in having LINA/Cigna provide claimants with claim-related information to claimants.

105.    For purposes of providing information relating to claim decisions made by LINA/Cigna to claimants upon their written request, LINA/Cigna and the plan administrator have joint control over the venture.

106.    For purposes of providing information relating to claim decisions made by LINA/Cigna to claimants upon their written request, LINA/Cigna and the plan administrator share profits and losses from the venture.

107.    For purposes of providing information relating to claim decisions made by LINA/Cigna to claimants upon their written request, LINA/Cigna and the plan administrator are joint venturers.

108.    Defendant LINA/Cigna is the *de facto* Plan administrator.

109.    Under ERISA, Ms. Sanchez is entitled to all information relevant to her claim, free of charge.  29 U.S.C. §§ 1132(a)(1)(A) and (c)(1)(B).

110.    Under ERISA, if an administrator fails to provide requested information within 30 days of a request, it is liable for statutory penalties in the amount of $110 per day for each day the information is delayed.  *Id*.; *see also* 29 C.F.R. 2575.502c-1.

111.    The Plan delegated the authority for administering claims and providing claimants with relevant information to Cigna, in its capacity as the Plan administrator's agent and/or in its capacity as a joint venturer and/or in its capacity as the *de facto* Plan administrator.

112.    The Plan administrator does not have access to Ms. Sanchez's claim file.

113.    Cigna's privacy policies prevent it from providing Ms. Sanchez's claim file to the Plan administrator.

114.    The Plan administrator did not rely on so-called Reed Group guidelines in administering Ms. Sanchez's claims.

115.    Cigna is the Plan administrator's agent for providing claimants with claim-related information upon the claimant's request.

116.    Cigna and the Plan administrator are joint venturers with respect to the obligation to provide claimants with claim-related information upon the claimant's request.

117.    Cigna is the *de facto* Plan administrator.

118.    On January 25, 2015, Ms. Sanchez requested all information relevant to her claims from Cigna.

119.    While Cigna provided some information relevant to Ms. Sanchez's claim, it failed to provide all relevant and requested information, and failed to timely provide other information.

120.    Because Cigna failed to timely provide all relevant information, Ms. Sanchez was prejudiced in her ability to prepare her appeal.

121.    Because Cigna failed to provide all relevant information, Ms. Sanchez was prejudiced in her ability to develop the ERISA administrative record.

122.    Because Cigna failed to provide all relevant information, and because Cigna is the Plan's agent and/or joint venturer and/or is the *de facto* plan administrator with respect to Ms. Sanchez's claim and her request for information pursuant to ERISA, Ms. Sanchez is entitled to statutory penalties of $110 per day for each day the production of that information has been delayed.

123.    Because Cigna failed to provide all relevant information, Ms. Sanchez is entitled to discovery to enable her to fully develop the ERISA administrative record.

Among other things, Ms. Sanchez should be entitled to receive the entire Reed Group guidelines Cigna relies upon in administering LTD claim, and should be entitled to any and all policies and procedures for applying those guidelines.

WHEREFORE, Plaintiff Tricia Sanchez prays for judgment as follows:

A. For long-term disability benefits due under the Plan and/or an order enforcing her right to benefits under the Plan;

B. For reinstatement of her life insurance waiver of premium claim and/or an order enforcing her right to LWOP benefits under the Plan;

C. For any other benefits to which Ms. Sanchez may be entitled due to her disability;

D. For statutory penalties against Cigna in the amount of $110 per day until such time as all relevant information is provided to her;

E. For prejudgment interest at the maximum legal interest rate until paid;

F. For attorney's fees and costs incurred as a result of prosecuting this suit pursuant to 29 U.S.C. § 1132(g); and

G. For such other relief as the Court deems just and proper.

DATED this 28th day of September, 2015.

LAW OFFICE OF PATRICK MAUSE, PLLC

By   s/  Patrick W. Mause
Patrick W. Mause
Attorney for Plaintiff